Kenneth Lenk, *pro se*
3310 South Buckskin Way
Chandler, AZ 85286
(215) 668-8136
ken_lenk@yahoo.com

☒ FILED    ☐ LODGED

# Sep 14 2023

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

### PHOENIX DIVISION

**Kenneth Lenk;**                                    ) Civil Action: **CV23-00228-PHX-DMF**

       Plaintiff, *pro se*                        )

vs.                                                          ) **PLAINTIFF'S FIRST AMENDED**

**Maxim Integrated Products, Inc.;** ) **COMPLAINT FOR VIOLATION**

      Defendant                                  ) **OF ADEA AND STATE LAWS**

                               **(SOX and DODD-FRANK ) added**

                               **claims**

                               **JURY TRIAL DEMANDED**

## COMPLAINT FOR AGE DISCRIMINATION / RETALIATION

Plaintiff Kenneth Lenk ("Plaintiff" or "Lenk") brings this action for violations of his civil rights and associated unfair competitive practices against Defendant as follows:

### NATURE OF THE ACTION

1.   This is an action for civil right violations of the *Age Discrimination in Employment Act (ADEA 29 U.S.C. § 621-634),* and/or *California's Fair Employment and Housing Act (FEHA) California Gov. Code, § 12940,* and/or *Arizona Statute A.R.S. Sec. 41-1463, as well as for SOX Retaliation 18 U.S.C. § 1514A and Dodd-Frank 15 U. S. C. §78u– 6 et al.*

THIS DOCUMENT IS <u>NOT</u> IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

1ˢᵗ AMENDED COMPLAINT FOR DAMAGES          REFERENCE **Cɪᴠ·ʟ·ʀ.5·4**          1
(Rule Number/Section)

2.   This action also addresses Maxim's unfair competitive practices (*California Business & Professional Code § 17200*) obtained by violating those age discrimination laws.

3.   Defendant Maxim Integrated Products, Inc. (hereinafter "Maxim") has violated and continues to violate, has contributed to and continues to contribute to the violation of Plaintiff's civil and other rights guaranteed by federal and state laws. Defendant's illegal activity has and continues to cause Lenk to suffer damages and irreparable harm.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over the subject matter and parties pursuant to *28 U.S.C. § 1331* and *28 U.S.C. § 1343* to redress the unlawful deprivation of Lenk's rights secured, guaranteed and protected by federal law. Federal question jurisdiction arises pursuant to *ADEA (29 U.S.C. § 621-634)*.

5.   This Court has supplemental jurisdiction pursuant to *28 U.S.C. § 1367* for the state law claims so related.

6.   This Court has jurisdiction under *28 U.S.C. § 1332* due to diversity of citizenship and the amount of damages claimed is greater than $75,000.

7.   Venue is proper under *28 U.S.C. § 1391* since Maxim does business in this district; since Plaintiff is domiciled in this district during the recent illegal acts of age discrimination; since the positions Plaintiff applied are in this district; and since the majority of pertinent witnesses are in this district.

## PARTIES

8.   Plaintiff Kenneth Lenk is a natural person over 40 years old at all times relevant, and at the time of complaint construction, is 64 years old. Lenk is domiciled in Maricopa County at 3310 South Buckskin Way, Chandler, Arizona, 85286. At all times relevant, Lenk was an applicant, pursuant to *Cal. Code of Regs., title 2, § 11008(a) et al.* for employment at Maxim.

9.   Defendant Maxim Integrated Products, Inc. is a company incorporated in Delaware (EIN # 94-2896096) with a Maricopa County business location at 531 E Elliot Rd, Chandler, AZ 85225, and with their headquarters located at 160 Rio Robles San Jose, CA 95134. According to Maxim in their January 31, 2022 response to the CA DFEH, they employ over 7,000 people. On August 26 2021, Analog Devices, Inc. acquired Maxim.

10. The Arizona Corporation Commission lists Maxim (#F13723656) as active, with CORPORATION SERVICE COMPANY as its agent located at 8825 N 23rd Avenue, Suite 100, PHOENIX, AZ 85021.

11. Maxim employs greater than 20 employees and is an employer pursuant to The Age Discrimination in Employment Act *(ADEA) - 29 U.S.C. § 630(b).*

12. Maxim employs greater than 15 employees in Arizona and is a covered entity/employer pursuant to *A.R.S. Sec. 41-1461.*

13. Maxim employs greater than 5 employees in California and is an employer pursuant to *California Gov. Code, § 12926(d).*

## FACTUAL BACKGROUND

14. Lenk was employed at Maxim as Application Engineer in their Horsham, PA office from 1997 to 2001. Lenk was under 40 years of age when hired. During this time, Lenk provided service for the Detroit region, as Maxim's first Automotive Field Application Engineer and Automotive Product Definer – Maxim has been highly successful with their automotive business since then, as a result of Lenk's initial efforts.

15. Maxim recognized Lenk's hard work and contributions by promoting him to the Eastern Region Field Application Manager. Later, Maxim relocated him to Dallas, Texas and promoted him to Eastern Region Director of Field Applications. Lenk received excellent performance reviews while at Maxim (**EXHIBIT A**).

16. Lenk moved to Maxim's Sunnyvale, California Headquarter location as Director of Business Management for the SSIP group. In 2005, Lenk left Maxim for a better opportunity at Freescale (now NXP).

17. Lenk gained significant semiconductor industry experience working at Maxim's competitors (had greater responsibilities and larger management roles). Lenk gained valuable skills in larger markets with top tier customers. Of specific importance was Lenk's experience at Freescale (NXP) as Strategy Director for Analog and Sensor Products, as Operations Manager (Lenk was promoted to this role at Freescale), at Intersil (Renesas) as Automotive Products Marketing Manager for Automotive Battery Management Systems and at Monolithic Power Systems as Marketing Director (Business Manager) for Automotive and Industrial Products (Medical is typically included under Industrial sector in the semiconductor industry). Lenk noted such roles in his resume and provided this resume to Maxim for employment consideration.

18. Lenk, familiar with Maxim, applied to several positions he was highly qualified for, believing he would be a significant contributor as before.

19. On May 18th, 2021, Lenk contacted Maxim's Kevin Schemansky (via LinkedIn) about an opening there for a Business Manager for Automotive LED Lighting. Lenk originally hired Schemansky when Lenk was Maxim's Field Application Engineering Manager. Kevin Schemansky is currently Maxim's Director of Product Definition (Automotive).

20. Lenk had prior automotive experience at Maxim, and experience as LED Business Manager for Maxim's SSIP group. Lenk obtained additional Automotive Business Manager experience at Intersil and Monolithic Power Systems. Lenk was a perfect matched for this position.

21. Lenk never heard back from Schemansky and messaged him again (via LinkedIn) on May 27th, 2021, asking about the compensation (for the Business Manager for Automotive LED Lighting).

22.  Schemansky responded later that day, stating in part: ***"It was a Jr. BM position and we extended an offer to a young candidate"*** (**EXHIBIT B**).

23.  Since Schemansky worked for Lenk prior, he as well as others at Maxim including their Maxim's Human Resource Manager, Rod Ibieta (who Lenk worked with at Freescale), are aware of his age. Based on Schemansky's comment, Maxim considered Lenk to be too old for employment consideration for this (and other) positions.

24.  Since the personal relationship with Kevin Schemansky did not work as expected, Lenk applied on Maxim's career web-site for the following positions.

25.  **Senior Business Manager -- Battery Management Systems, May 28th, 2021, (R10607) --** Lenk was extremely qualified for this position since he had Business Manager experience at Maxim; as Senior Business Manager (Marketing Manager) for Battery Management Systems at Maxim's competitor Intersil/Renesas doing the same exact function Maxim sought; as Director of Business Management for Automotive products at Monolithic Power Systems, and as Strategy Manager at Freescale (the largest automotive semiconductor provider at that time).

26.  On June 5th, 2021, Maxim sent an email stating: *"Dear Kenneth Lenk , We appreciate your interest in Maxim Integrated and your application for the position of Senior Business Manager (Battery Management Systems) . After sincere consideration, we have decided to move forward with another candidate whose background is a closer fit for the required skill set. We encourage you to apply for other advertised positions at our company that you feel qualified for. Our team will keep your resume on file for consideration at a later date should a suitable position arise. Thank you for your interest in our company; we wish you personal and professional success with your job search."*

27. Maxim later claimed in their January 31, 2022 response to the CA DFEH stating: *"you did not possess the requisite qualifications necessary to meet the expectations of either position."* Maxim was referring the *"Senior Business Manager or a BSM Application Engineer"* positions in their response.

28. Lenk had significant industry experience at several of Maxim's competitors in the automotive market, was one of the first to start Maxim's automotive business, and was the Director of Strategy for the largest automotive IC supplier during the time of his employment. Lenk exceeds the requirements for the R10607 position (illustrated by companies that interviewed him for similar positions noted later in this complaint).

29. To prove his competence for the positions applied to, Lenk responded to the California DFEH (Civil Rights Division or CRD) specific details for Maxim's R10607 position requirements (with Lenk's comments in ***italics***):

**Job Description Summary:**
The Business Manager for Automotive BMS has the opportunity to use Maxim's tremendous technology and infrastructure to expand a business in the rapidly growing market of electrified vehicles. You'll work with companies developing advanced drive capabilities and electrified drive trains. The Business Manager role at Maxim is exciting and dynamic. You will have revenue and GM responsibility for your market segment.

**Job Description:**
Grow revenue and profit in your market segment ***(proven experience in resume)***
Drive go-to-market strategies for our Automotive BMS product line ***(proven experience in resume)***
Develop strong relationships with the key decision makers in the automotive market ***(per resume)***
Assist in the design-in process and drive to revenue realization ***(proven experience in resume)***
Help drive the product roadmap for next generation BMS products ***(per resume)***
Travel globally to meet with customers and partners ***(proven experience in resume)***
Work in the fast paced, energetic company ***(proven experience in resume, plus performance reviews at Maxim)***

Publish application notes and marketing material **(per resume and have created application notes and marketing materials at Maxim during his employment there).**

Work with Applications and Product Definitions team on new use cases and collateral **(per resume, and have done both roles prior at Maxim).**

**Minimum Qualifications & Required Competencies**

Strategic thinker. Need to build a strategy that gives the best chance for long-term *success* **(per resume and prior history at Maxim, and at Freescale as Director of Strategy for the largest automotive IC supplier)**

Relationship builder. Need to connect with customers and ecosystem partners. **(per resume and prior history at Maxim)**

Committed. Willing to do whatever is needed to get the product into customers hands and win the business. **(per resume, prior history at Maxim and by Maxim's own Performance Reviews)**

Great communicator. Ability to boil down information and communicate with both executives and engineers. **(per resume and prior history at Maxim)**

Analytical and Detailed. Can drill into problems and logically solve them. **(per resume and supported by Maxim's own Performance Reviews)**

Collaborator. Work with the other teams to provide real world system level solutions to our customers. **(per resume and supported by Maxim's own Performance Reviews)**

Technical guru. Must have a working knowledge of semiconductor technology and a thirst for technology. **(per resume and prior history at Maxim, and at Freescale as Director of Strategy for the largest automotive IC supplier at that time)**

BSEE with 8+ years of work experience or MSEE with 6+ years of work experience. **(per resume).**

Product marketing experience is nice to have. **(per resume and prior history at Maxim)**

30. Maxim responded to the California Civil Rights Department Complaint # 202108-14597127 claiming *"legitimate business reasons"* to exclude Lenk from a free and fair opportunity to participate in employment. Despite not being listed as any requirement, Maxim claims the gap in his resume excluded him from employment participation for the Automotive Business Unit (ABU) group positions. Maxim's response is pretext, prejudicial by definition and inconsistent with the Maxim's prior and current actions for other positions in the company (as illustrated later in this complaint).

31. Given the very limited number of available candidates that possess Business Manager skills and Automotive Battery Management System experience, Lenk was worthy of consideration. This is especially true given his prior experience with Battery Management Systems (at Intersil/Renesas), his prior success at Maxim starting up their automotive business as well as positive recommendations/promotions from his prior Maxim manager Peter Cornelius. It is surprising to note that Lenk was not even phone interviewed, especially since Maxim *"after not having found a suitable candidate by October, Maxim closed the Job Requisition."*

32. Maxim had a suitable candidate, but excluded Lenk, due to age.

33. **Senior Business Manager, June 8th, 2021, (R10692)** -- Lenk was again highly qualified for based on his career history at Maxim's competitors and the requirements in job description.

34. On June 30th, 2021, Maxim sent an email stating: *"Dear Kenneth Lenk,* *"We appreciate your interest in Maxim Integrated and your application for the position of Senior Business Manager . After sincere consideration, we have decided to move forward with another candidate whose background is a closer fit for the required skill set."*

35. Given Lenk's experience at Maxim's competitors successfully doing similar Business Manager roles and prior excellent performance at Maxim, it is again surprising that he was not at least phone interviewed, as does Maxim's competitors.

36. To illustrate Lenk provides an August 20, 2021 phone interview confirmation for a similar Senior Product Marketing (Business) Manager, Power Management ICs offered by Maxim's competitor Infineon. Infineon was a provided with a significantly similar resume (or exact) to that provided to Maxim. Infineon found the skills listed in Lenk's resume adequate to

consider phone interviewing Lenk even with the *"resume gap"*, while Maxim did not, due to their illegal age discrimination. (**EXHIBIT C**).

37. Maxim claimed (in their January 31, 2022 response to the CA DFEH) Lenk's: *"lack of relevant technical experience"* excluded him from employment. This is highly inconsistent with Lenk's resume indicating several positions with Business Management experience and the Infineon phone interview above (occurring 2 months after his application to Maxim).

38. Maxim's *"resume gap"* argument is not supported by other industry peers offering similar positions, and thus, is pretext.

39. During the same (2021) time period, Lenk applied to similar positions offered by Maxim's competitors. None of these companies noted any concern about the *"resume gap"*, and instead, interviewed Lenk as follows: 1) SiTime, 18 Aug 2021, Sr. Product Marketing -- MEMS, (1 phone interview); Halo Microelectronics, 02 Aug 2021, System Applications Engineer/Product Definer – ASIL Automotive (2 phone interviews); Texas Instruments, 14 Jul 2021, Systems Manager (2 phone interviews); Microchip, 01 Nov 2021, Product Marketing Analog Products GAN Manager (3 phone interviews, 1 group); Renesas 18 Mar 2022, Automotive Field Application Engineer, (3 internet interviews, 2 group).

40. Per the above interviews, Maxim's industry peers note Lenk's qualifications (per his resume) for the role, and did not use *"resume gaps"* for filtering of applicants, as Maxim does, again supporting pretext.

41. **BMS SMTS Applications Engineer June 17th, 2021, (R10119)** – Lenk was highly successful at Maxim as an Application Engineer (**EXHIBIT A**) and he exceeded the job requirements via the experience obtained at other companies listed in his resume.

42. On July 6th, 2021, Maxim sent an email stating: *"Dear Kenneth Lenk , We appreciate your interest in Maxim Integrated and your application for the*

1   *position of BMS SMTS, Applications Engineer . After sincere consideration,*
2   *we have decided to move forward with another candidate whose background is*
3   *a closer fit for the required skill set."*

4   43. Maxim stated in their January 31, 2022 response to the CA DFEH:
5   *"This Job Requisition was also unfilled and closed"* despite their prior
6   disingenuous representation (email above) stating they *"decided to move*
7   *forward with another candidate whose background is a closer fit for the*
8   *required skill set."*

9   44. Maxim continued in their January 31, 2022 response to the CA DFEH:
10  *"Mr. Lenk was further disqualified from interviewing for the Engineering*
11  *position on the grounds that his June 17, 2021 application patently showed he*
12  *had no practical engineering experience working with semiconductor*
13  *applications, testing, or electronic circuit designs or hands on lab experience*
14  *working with circuit schematic design, simulation, and PCB. In fact, Mr.*
15  *Lenk's work history was void of ever having worked as an Engineer. For these*
16  *reasons, Mr. Lenk was not qualified for this position."*

17  45. This is a disingenuous (libel, and false representation to a government
18  agency pursuant to *18 U.S. Code § 1001(a)(3))* response. Lenk had the
19  required amount of application experience at Maxim alone, with excellent
20  results noted by his supervisor. Lenk had design and hands-on experience
21  listed in his resume: Design Engineer, Associate Engineer and Technician
22  (hands on) as noted in his Early Career section (**EXHIBIT D**).

23  46. Maxim's lack of skills response is inconsistent with their industry peers
24  (Texas Instruments), as recently as January 25, 2023. On this date (at 7:34
25  pm), talent@ti.com emailed Lenk suggesting (based on his resume) that he
26  was a good match for their Test Engineer - BMS Battery Monitor 22000BUJ
27  in Dallas US (a role with significantly similar requirements).

28  47. Maxim's *"lack of skills (or Engineering)"* excuse is pretext.

48. Maxim states in their January 31, 2022 CA DFEH response: *"Maxim employs and hires highly qualified persons"*. Maxim thought Lenk qualified for his initial Application Engineering role when they hired him in 1997 (with similar job requirements) else he would never been hired (or promoted).

49. Prior performance review comments from Manager Cornelius illustrates Lenk's performance is consistent with Maxim's objectives – *"Ken has developed a good sense for the business and how to succeed within our organization"* (2000 Annual Performance Review)*; "As his manager, I can rely on him to get the job done. Ken is cost-conscience, pro-active and anticipates. He has scored above average now for more than 12 quarters. Without hesitation, we recommend to promote Ken to director level"* (2001 Annual Performance Review).

50. Lenk had excellent prior Application Engineering experience at Maxim and was promoted twice based on his excellent work performance. Maxim clearly ignored these factors, due to his age. It was again amazing that Lenk was not even contacted for a phone interview. Maxim's claim *"we have decided to move forward with another candidate whose background is a closer fit for the required skill set"* is equally surprising, since the position was still on Maxim's career site for hire (as of July 27, 2021). Maxim's response is pretext for their real motivation, age discrimination.

51. **Senior Business Manager, Advanced Sensors July 7th, 2021, (R10389)** – Lenk had prior history with sensors at Maxim, had prior Business Manager experience at Maxim, and had Sensors Operation Manager experience at Maxim's competitor NXP/Freescale (which included sensors for healthcare products). Hence he was an excellent candidate for this position. Despite his qualifications, Maxim did not contact him for this position. This position remained open for hire on Maxim's career site (as of July 27, 2021). Lenk then applied for this position on LinkedIn listed as

**Senior / Executive Business Manager Position (advance sensor product line) on July 30th, 2021 (R10389, via LinkedIn).**

52. On July 31st, 2021, LinkedIn provided data for this role, stating there were 4 candidates (at that time) that applied for the position. LinkedIn stated that Lenk had: *"You have 10 out of 10 top skills among all other applicants"*.

53. LinkedIn reported that Lenk's application was reviewed by Andrew Baker, the job poster at Maxim. This was exciting news, since Lenk worked with Andrew Baker at Freescale when Lenk was Director of Analog Strategy and Consumer & Industrial Sensor Operations Manager (which included the medical experience Maxim sought in the job description).

54. During Mr. Baker's time at Freescale, he was the Analog (AMPD) Market Segment Manager in SASD (Baker, Ibieta and Lenk were all in the SASD group). On Lenk's information and belief, Mr. Baker managed the Consumer & Industrial Analog Products (including the medical market).

55. At that time Lenk was the Operations Manager for the Consumer and Industrial Sensor Products (including the medical market). The Sensor group was located adjacent to the Analog group and shared common resources and participated in the same meetings.

56. Mr. Baker (as Marketing Manager) should have been aware of the SASD products that contribute to the SASD group's revenue. Mr. Baker should have known the millions of sensors Freescale provided to the medical markets annually (and their associated revenue) – of which invasive blood pressure monitoring and sleep apnea equipment are just two examples.

57. Lenk listed medical markets in his resume (at both Maxim and Monolithic Power Systems). To reject Lenk for this position, Baker had to ignore his personal knowledge of Lenk's background (providing sensors to the medical market at Freescale); had to ignore his resume, had to ignore that LinkedIn stated he had 10 out of the 10 requirements (uncommonly good

match), and had to purposely avoid performing any type of interview or other investigation to see if Lenk was the good fit LinkedIn suggested. Baker's lack of contact is not typical of a company seeking candidates for employment.

58. With only 4 candidates to choose from, Baker (Maxim) purposely ignored Lenk's application. Given Lenk's prior excellent work history at Maxim (and promotions), his qualifications for the role based on; 1) personal knowledge, 2) strength of resume, and 3) validation by LinkedIn for the skills match, there is no reasonable explanation for Maxim to exclude Lenk from consideration, except for age discrimination.

59. Maxim had to ignore Lenk's obvious qualifications, not only those stated in his resume, but by those who worked with him prior. Maxim had to ignore independent party's opinions (i.e. LinkedIn) and their own prior evaluations of his excellent performance.

60. Maxim did not reject Lenk's application for employment earlier when he was under 40 years old, even though he was less qualified then (Maxim hired him and promoted him twice). Lenk is even a better candidate due to additional work experience since, though it is obvious that Maxim has no interest in older qualified talent, and rather hire younger persons.

61. Despite personal relationships, Lenk's qualifications and experience and other factors that would contribute to a positive job application outcome, Lenk was *"blacklisted"* from employment at Maxim due to his age.

62. Lenk has successfully obtained employment in other companies – Intersil (Renesas) and Monolithic Power Systems even when over 50 years of age. As with the Maxim positions, he had adequate skills for those roles.

63. Lenk is highly qualified for all the Maxim positions applied to, had excellent prior work performance at Maxim and should be able to fairly compete for the positions. Maxim should not be illegally age discriminating

1   against him, consistent with the spirit of the *Federal ADEA, California's*

2   *FEHA 12940* and *Arizona A.R.S. § 41-1463*.

3   64. Maxim hides their true age discrimination motive via disingenuous

4   excuses. Maxim's *"resume gap"* excuse is pretext.

5   65. As noted in Lenk's resume, he was Maxim's Business Manager -- Silicon

6   Subsystems (SSIP) group in 2004-2005. During that time, Maxim hired a

7   peer Business Manager, Robert Badalian. On Lenk's information and belief,

8   Mr. Badalian had a significant *"resume gap"* in his history, which did not

9   affect his hiring by Maxim at that time, due to his younger age. Maxim's

10  *"resume gap"* excuse is pretext; inconsistent with their prior performance.

11  66. Mr. Badalian's *"resume gap"* was not a concern, since he fit into Maxim's

12  ideal demographics (for age) based on Zippia.com data below:

**Maxim Integrated Employee Age Breakdown**

| Employee Age | Percentages |
|---|---|
| Less than 18 years | 1% |
| 18-20 years | 6% |
| 20-30 years | 46% |
| 30-40 years | 27% |
| 40+ years | 20% |

26  67. According to Zippia.com, only 20% of Maxim employment is 40+ years

27  old, a significantly lower value than that reported by the Bureau of Labor

28  Statistics (2021 data), below, for total employment partitioned by age sector.

| Occupation 2021 | Total, 16 and over | 16 to 19 years | 20 to 24 years | 25 to 34 years | 35 to 44 years | 45 to 54 years | 55 to 64 years | 65 years and over | Median age |
|---|---|---|---|---|---|---|---|---|---|
| Total employed (in K) | 152581 | 5266 | 13409 | 34578 | 32734 | 30554 | 25912 | 10127 | 42.2 |
| % | | 3% | 9% | 23% | 21% | 20% | 17% | 7% | |

68. Since the age partitions do not align, compare the BLS 45+ data to Maxim's 40+ data, favoring Maxim by 5 years (since the 40-45 is not counted in the BLS data, roughly 10% of total employment). The total 45+ employment reported by the BLS is 44% (20+17+7) versus the 20% for Maxim as reported by Zippia. Maxim's 40+ employment is less than half of the BLS total employment, inferring Maxim discriminates against older persons.

69. The Supreme Court in *Watson v. Fort Worth Bank & Tr., 487 U.S. 994 (1988),* notes statistical disparities raise the inference of causation and establish a prima facie case of discrimination. This data can be used in deciding the final prong of McDonnell Douglas framework, per *Reeves.* The Supreme Court held *"it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 146-7 (2000). Reeves* allow the trier of fact to consider evidence used to establish a prima facie case of discrimination when deciding the final prong of McDonnell Douglas framework. How the employer treats similarly situated (but younger) employees plays a key role in age discrimination cases.

70. A similar age discrimination action (older persons underrepresented for employment based on BLS data) was addressed by the Ninth Circuit: *Rabin v. PricewaterhouseCoopers LLP, 236 F. Supp. 3d 1126 (N.D. Cal. 2017).*

71. Other Maxim job postings suggest that the *"resume gap"* excuse is pretext since they specifically state opposite requirement criteria. One example is the Jun 17, 2021 posting for MTS, Applications (R10872), listing the specific skills needed for the position below:

"SPECIFIC SKILLS:
MUST POSSESS EXPERTISE/ KNOWLEDGE SUFFICIENT TO ADEQUATELY PERFORM THE DUTIES OF THE JOB BEING OFFERED. EXPERTISE/ KNOWLEDGE MAY BE GAINED THROUGH EMPLOYMENT EXPERIENCE OR EDUCATION. **SUCH EXPERTISE/ KNOWLEDGE CANNOT BE "QUANTIFIED" BY "TIME"**" (**emphasis** added).

72. Maxim's response to California Civil Rights Division claiming that they use *"resume gaps"* (to exclude persons from employment) is an admission of both disparate treatment and impact age discrimination based on statistics provided by U.S. Bureau of Labor Statistics (BLS) at www.bls.gov/web/empsit/cpseea36.htm.

73. Using September, 2022 data, the BLS reports the longest unemployment duration (longest resume gap) correlates to the older 55 to 64 year old age group partition. Maxim, familiar with BLS data, discriminates against older persons by looking for *"resume gaps"*, since larger gaps correlate to older persons. Maxim's *"resume gap"* is age discrimination, based on the BLS data.

74. Maxim's own employees note the company's age discrimination per indeed.com (now shared with Analog Devices Inc): 1) Product Marketing Manager - H.S. Diff. Amplifiers (Former Employee) - Wilmington, MA - July 2, 2013: *"**Do not count on working here,** or any tech firm **beyond age 60**"* and 2) Product Manager (Former Employee) – 88 San Jose, CA - February 10, 2017: *"**It was good company, but recently they changed their policy and not treating older employee as good as before**"*.

75. Maxim's own employees note concerns about the company's HR group on glassdoor.com: 1) Senior Member of Technical Staff in San Jose, CA on May 06, 2010 notes *"**While you are it hire a HR department so that people can go and lodge complaints against your unethical behavior**"* and *"7,000 employee company with no HR department. **Incapable of policing themselves**"*, 2) Anonymous Employee on Dec 21, 2017 reiterates the HR

issue: *"weak HR dept as well"*, 3) Principal Member of Technical Staff in Sunnyvale, CA on Aug 12, 2011 notes: *"There is a deliberate policy to get rid of old employees"*, 4) Senior Manager in Portland, OR on Sept 10, 2020: *"First: Fire the HR department. They just get in the way." Just admit that they're not much more than a way to limit corporate liability and hire lawyers instead"*, 5) Technical Staff Design Engineer in Chandler, AZ on May 25, 2020: *"HR team should do better"*.

76. Maxim's employee HR concerns are validated by Plaintiff, based on his previous experience with Maxim's ABU HR Manager, Rod Ibieta.

77. Lenk asserts Maxim's ABU HR Manager, Rod Ibieta, acting in conjunction with Maxim management, age discriminated against him.

78. Mr. Ibieta's Linked-In profile states he is Maxim's *"HR Manager supporting the Automotive Business Unit (ABU) and the company's Chandler site"* (Jun 2019 - Jul 2022). Several positions (such as R10607) that Lenk applied to are in the ABU group.

79. During 2008, Lenk worked with Mr. Ibieta at Freescale's SASD division. Mr. Ibieta was Freescale's Human Resource Manager for the SASD division, and was aware of Lenk's age. As mentioned, Mr. Ibieta was in the same SASD group as was Baker and Lenk.

80. It is interesting that Maxim found other Freescale SASD personnel suitable for hire (such as Ibieta and Baker), but barred Lenk due to his age.

81. Lenk's interaction with Mr. Ibieta at Freescale included hiring. Lenk recalls one significant conversation with Mr. Ibieta during that time when Lenk was to interview a protected candidate (>40 years old) for an open position in his group. Lenk was discussing the candidate with Mr. Ibieta (in a hallway conversation going to the interview room). During that conversation, Mr. Ibieta advised Lenk, that while you can not disqualify a candidate due to age, you can always find something else to exclude him for. This was a clear

signal from Mr. Ibieta that Freescale management did not want Lenk to hire the older person, and to find another excuse for rejection (to avoid legal issues). This left a lasting impression with Lenk, as this is not a comment he expected from an experienced Human Resource Manager.

82. Later in 2008, Mr. Ibieta's position was eliminated and he departed Freescale. Per Mr. Ibieta's current LinkedIn information, he no longer works at Maxim, circa July 2022.

83. On Lenk's information and belief, Maxim's Ibieta, in an established pattern and practice, guided interviewers as he did with Lenk at Freescale. Maxim's *"resume gap"* is a fabricated excuse (pretext) to exclude him from employment, to cover up Maxim's age discrimination. The *"resume gap"* construct suggested for the disqualification is disingenuous, though consistent with Mr. Ibieta's prior pattern and practice.

84. Maxim did not list recent experience as a job requirement for any position Lenk applied to, which is contradictory to other Maxim listings, as previously noted. Maxim's *"resume gap"* excuse is pretext which appears to be focused on their current ABU group positions.

85. As another example that the *"resume gap"* pretext excuse is bogus, Lenk offers positions he applied to at Maxim earlier in time, as early as 2009 (**EXHIBIT E**). These applications occurred during times when no significant *"resume gap"* existed, yet Maxim still excluded Lenk due to his age.

86. Even Maxim's new parent company, Analog Devices Inc. did not age discriminate against Lenk as evident by their employment offer to Lenk (**EXHIBIT F**) for a similar Product Marketing Manager role. Lenk is clearly qualified for these roles, as noted by his resume and by Maxim's new parent.

87. As another proof point of age disparate/impact treatment, Maxim states in their rejection notice that: *"Our team will keep your resume on file for*

*consideration at a later date should a suitable position arise."* This is disingenuous, as Maxim never sent any positions to Lenk, due to his age.

88.  This is inconsistent with Maxim's peers, who provide such notifications. One such example is below, from industry competitor Renesas, in response to Lenk's application for a similar Marketing Manager position there:

renesaselectronics-jobnotification@noreply12.jobs2web.com
To: Kenneth Lenk, Sat, Oct 15 at 12:39 PM
Renesas Electronics Corporation
The following jobs matched your search agent at Renesas Electronics Corporation and can be found at jobs.renesas.com.
Agent:
Product Marketing Manager for Power Management IC, Milpitas CA US
Job Matches:
**Sr. Staff Application Engineer** - San Jose, CA, US
Principal Mixed Signal Verification Engineer - Santa Clara, US
**Automotive Functional Safety Engineer** - Milpitas, CA, US
**Sr Mgr, Product Marketing** - Milpitas, CA, US
**Engineering Technician 5** - San Jose, CA, US
**Senior Systems & Applications Engineer** (Dialog05727) - Santa Clara, US
Staff Packaging Engineer - San Jose, US
Front End Digital Design Engineer - Milpitas, CA, US
**Manager, Product Marketing, Automotive Analog and Power Division** - Milpitas, CA, US
**Sr Application Engineer** - Milpitas, CA, US

89. Plaintiff receives frequent job position notifications from Maxim's competitors (i.e. Renesas, Texas Instruments, On Semi) in response his position applications at those companies. The most recent occurred during this complaint construction, on Sat, Jan 28 at 11:33 PM, which Renesas noted these current Job Matches:

**Power Management Test Engineering** Intern - Milpitas, CA, US
**Senior Staff Field Applications Engineer, Automotive Analog and Power** Products - Milpitas, CA, US
Principal RF Wireless Engineer - San Jose, CA, US
**Principal Field Applications Engineer** - Milpitas, CA, US
Web DevOps & Infrastructure Engineering Lead (remote) - Milpitas, CA, US
**Director Product Marketing and Applications** - San Jose, CA, US
Manager IT - Order to Cash Business Applications - San Jose, CA, US
Intern - Milpitas, CA, US

Senior Staff Quality Assurance Engineer - Milpitas, CA, US
Senior Director, Hardware Engineering - San Jose, CA, US
(**similar positions** to those applied to at Maxim are highlighted in **bold**)

90. Note that Renesas' recommended job matches (similar/same resume submission) are similar to those positions Maxim rejected Lenk for.

91. Maxim not only age discriminates in their individual review of Lenk's applications (treatment), but Maxim hinders other older candidates (impact) by programming their Applicant Tracking System to exclude position matches based on age (via filters in the Applicant Tracking System).

92. On 18 Oct 2022, Lenk reviewed his R10607 application information on Maxim's career section, https://wd1.myworkdaysite.com/en-US/recruiting/maximintegratedproducts/MaximCareers/viewApplication/7f4a3a4d60dc813b552e59befa0135b8.

93. The following Education information was copied from Maxim's career site, for Lenk's R10607 application therein:

**Education**
 School or University The Pennsylvania State University
From 1976
**To (Actual or Expected) 1981**
Degree Bachelors Electronics Engineering
Overall Result (GPA) 3.3

94. Per Maxim own records, they retain and use graduation date data from their application database. The use of graduation dates is illegal pursuant to *California's CCR, Title 2 §11079 - Advertisements, Pre-employment Inquiries, Interviews and Applications (b) Pre-employment Inquiries. Unless age is a bona fide occupational qualification for the position at issue, pre-employment inquiries that would result in the direct or indirect identification of persons on the basis of age are unlawful.*

95. Maxim use of age data provides them an Applicant's approximate age since the average age of college graduates in a 4 year program is 23 years old (per                    https://collegeonomics.com/what-is-the-average-age-of-college-

graduates/). Taking the current year (2022) minus the graduation year (1981), equals 41 years, plus 23 years provides Maxim with an approximate age of 64, which is Lenk's current age.

96. With the approximate age, Maxim discriminates (both disparate treatment and impact) against undesirable older candidates and then provides a bogus pretext excuse, such as *"resume gap"* to avoid legal consequences (as suggested by Maxim's HR Manager Rod Ibieta prior).

97. Maxim's *"resume gap"* exclusion is pretext to cover their age discrimination practice. Lenk exceeded the requirements for each position applied for. None of the positions listed recent experience as a requirement and other Maxim position requirements stated the opposite.

98. The Supreme Court clarified the age issue: *"a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." Bostock v. Clayton Cty., 590 U. S. __ (2020).* Changing Lenk's age would produce the *"but for"* outcome change, which has been shown here and will be further proven during discovery.

99. Maxim uses policies and practices related to hiring and employment described herein, that have had a disparate impact on the basis of age (discriminating against workers who are age 40 and older) that are not job-related for the positions at issue, nor consistent with business necessity and are not necessitated by any reasonable factor other than age.

100. Lenk provided Maxim with a Demand Letter via USPS First Class Mail on November 22, 2022 to Maxim's Maribel Hernandez at 160 Rio Robles, San Jose, CA 95134 and to Maxim's parent, Analog Devices' Janene Asgeirsson. On December 12, 2022, Maxim's/Analog Devices Sam Gutin, Associate Counsel stated via email: *"My name is Sam Gutin and I work or Analog Devices, Inc. I am writing to confirm that we have received you letter dated November 22, 2022, and will respond in the coming days."*

101. Maxim/ADI (Sam Gutin) responded on January 18, 2023 denying any wrong doing. Lenk's demand letter included a reasonable offer to settle, which Maxim failed to responded to.

102. Lenk exhausted his administrate requirements by filing California Civil Rights Division complaint #202108-14597127 (a.k.a. *EEOC # 37A-2022-00395-C*) to address the most recent age discrimination, and obtained the *'right to sue'* (**EXHIBIT G**) for #202108-14597127 (a.k.a. *EEOC # 37A-2022-00395-C*) on November 14, 2022 and filed this complaint in a timely manner.

103. Plaintiff respectfully requests the Court's consideration for Maxim's illegal activity to be addressed by the ***common-law discovery rule***. This doctrine *"read into statutes of limitations in federal-question cases [. . .] in the absence of a contrary directive from Congress."* It *"postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." Cada, 920 F.2d at 450.* Plaintiff did not discover Maxim's age discrimination was their true motive until May 27th, 2021, when Maxim's Director of Product Definition, Schemansky made it clear that Lenk would not be hired due to his age when he stated: ***"It was a Jr. BM position and we extended an offer to a young candidate".***

104. Plaintiff requests consideration since The Ninth Circuit permits a plaintiff to recover for acts outside the limitations period as long as the acts represented an ongoing unlawful employment practice pursuant to *Anderson v. Reno, 190 F.3d 930, 936 (9th Cir. 1999).*

105. Maxim's age discrimination (both disparate treatment and impact) is an on-going unlawful practice, by the individual events described herein and by the continuous age discrimination done by Maxim's Applicant Tracking system age filtering. Maxim's system discriminated against applicants each time a position is posted in which they are excluded when their skills meet the requirements of the role, as they did to Lenk.

106. Plaintiff asserts *equitable estoppel (fraudulent concealment)* applies since Maxim's applicant tracking system age discriminates against candidates without their knowledge, as demonstrated by the graduation date located in Lenk's application file on Maxim's career web-site.

107. Plaintiff further argues that *equitable tolling* applies, since Plaintiff through the exercise of reasonable diligence, could not *"obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant." Cada, 920 F.2d at 450.* Prior to May, 27, 2021, Lenk was unable to ascertain Maxim's age discrimination. Maxim's denials of Lenk for the Business Manager for Automotive LED Lighting and roles thereafter were revealing, as it exposed Maxim's true age discrimination.

108. Maxim's illegal actions fall under the *continuing violation doctrine* as identified by The Supreme Court: *National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002). The doctrine relieves a plaintiff of a limitations bar if he/she can show a series of related acts to him/her, one or more of which falls within the limitations period. Pegram v. Honeywell, Inc., 361 F.3d 272, 279 (5th Cir. 2004).*

109. The *continuing violation doctrine* *"allows courts to consider conduct that would ordinarily be time-barred 'as long' as the untimely incidents represent an ongoing unlawful employment practice.'" Morgan, 232 F.3d 108, 1014 (9th Cir. 2000).* Age discrimination is an unlawful employment practice, which Maxim denied Lenk from employment participation as early as 2009.

110. The *continuing violation doctrine* requires: *"(1) the defendant's actions inside and outside the limitations period are sufficiently similar in kind; (2) those actions occurred with sufficient frequency; and (3) those actions have not acquired a degree of permanence." Wassmann v. South Orange County Community College Dist. (2018).* Maxim's age discrimination actions are *"similar in kind"*, and occurred with *"sufficient frequency"*. Plaintiff

1  asserts that they did not *"acquired a degree of permanence"* until May 27th,

2  2021, when Maxim's Director of Product Definition Schemansky made it clear

3  that Lenk would not be hired due to his age when he stated: ***"It was a Jr.***

4  ***BM position and we extended an offer to a young candidate"***.

5

6  **FIRST CLAIM FOR RELIEF**

7  **Intentional Discrimination**

8  **Age Discrimination in Employment Act of 1967 (ADEA)**

9  **29 U.S.C. § 623(a)(1)**

10  111. Plaintiff incorporates all paragraphs of this Complaint as if fully set

11  forth herein.

12  112. Lenk filed timely charges with the EEOC and thus exhausted his

13  administrative remedies. Lenk filed this complaint in a timely manner after

14  obtaining his *'right to sue'* letter.

15  113. Age is not a bona fide occupational qualification for any of the positions

16  Lenk applied to.

17  114. Maxim foregoing conduct constitutes illegal, intentional discrimination

18  and unjustified disparate treatment prohibited by *29 U.S.C. § 623(a)(1)*.

19  Maxim knew and showed reckless disregard for their illegal conduct, and

20  failed to correct it.

21  115. Despite Lenk's excellent qualifications, his prior excellent work history

22  at Maxim, his experience at competitive companies, the fact that his peers

23  and subordinates are successful at Maxim, they failed to hire Lenk for

24  numerous positions he was extremely well qualified for due to his age.

25  116. Maxim hired younger and less qualified workers for the positions Lenk

26  applied for, despite that Lenk had better skills for the positions, as noted by

27  Maxim's Director Schemansky's admission on May 27, 2021.

28

117. Maxim intentionally age discriminated against Lenk by: 1) excluding him for positions he was qualified for, 2) by illegally using age information obtained in the application process (*CCR, Title 2 §11079* violation) which remains in their database, and 3) by failing to provide position opportunities for new openings, due to their applicant tracking system age screening.

118. Maxim's applicant system discriminates against older workers by providing younger workers opportunities denied to older workers, due to their age filtering.

119. Maxim intentionally age discriminated against Lenk thus providing a continuous pattern of age discrimination each time he applies for a position, as their illegally obtained/stored data was/is used to exclude Lenk from employment for each position he would otherwise be qualified for.

120. Lenk alleges he has and continues to suffer unemployment because of Maxim's illegal activity, in violation of the *ADEA* as alleged herein.

121. As a direct result of Maxim's willful and intentional discriminatory policies and practices described above, Lenk has suffered damages including, but not limited to, lost past and future income, compensation, diminished employment opportunities, humiliation, embarrassment and benefits.

122. Lenk is entitled to all remedies available for the *ADEA* violations including attorneys' fees, due to Maxim's illegal age discrimination.

## SECOND CLAIM FOR RELIEF

### Disparate Impact Discrimination

### Age Discrimination in Employment Act of 1967 (ADEA)

### 29 U.S.C. § 623(a)(2)

123. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

124. Plaintiff filed timely charges with the EEOC and thus exhausted his administrative remedies. Lenk filed this complaint in a timely manner after obtain his *"right to sue"* letter.

125. Maxim maintains discriminatory policies, patterns, and/or practices that have an adverse impact on applicants and prospective applicants ages 40 and older in violation of the ADEA and are not, and cannot be, justified by reasonable factors other than age, including but not limited to the following: 1) application filtering (exclusion) due to information obtained via their Applicant Tracking System, and 2) Maxim's preference for hiring and retaining younger employees as indentified in their web career postings.

126. Lenk, a job applicant, pleads disparate impact claim pursuant to: *Rabin v. PricewaterhouseCoopers LLP, 236 F. Supp. 3d 1126 (N.D. Cal. 2017)*.

127. Maxim age discriminates: 1) via their illegal use of data obtained in the application process, 2) by their applicant tracking system, 3) by guiding their employees to seek out *"resume gaps"* (a bias against older workers as noted by BLS data) and uncommon in the industry as noted by Maxim's competitors and parent company, and 4) by career postings focused toward younger applicants, including, but not limited to, Maxim's own career website.

128. Maxim promotes age discrimination via their internet photographs on their "OVERVIEW" and "EXPERIENCED" tabs on their career page (**EXHIBIT H**). These photos illustrate employment of younger persons in an attempt to encourage younger applicants at the expense of those over 40.

129. On their "EXPERIENCED" tab on their career webpage, Maxim boasts of several company initiatives, which include: *"Development Planning – Every achievement begins with a plan; MaximU – Continual learning available anywhere, everyday; Higher Education – Helping employees manage and continue their education; Developing Professionals of Maxim (DPoM); Women at Maxim"*. Excluding the age irrelevant Women at Maxim

paragraph/initiative, these other paragraphs/initiatives strongly focus on the younger up and coming professional (i.e. "*Development Planning, Developing Professionals*"), as none of these initiatives focus on the needs or interests of older workers, whose career is already well established.

130. Similarly, information on the "BENEFIT" tab of Maxim's career webpage is focused on benefits that are primarily of interest to younger workers, such as: "*Paid parental leave, Onsite exercise rooms and/or weights at many of our facilities, Individual and team sports activities*" with little to no focus on benefits older workers are more likely to take advantage of, such as time off to care for a sick parent or spouse. Maxim instead lists: "*Generous time-off programs for vacation, holidays and sick time*" without any consideration about care for older persons, as their benefits are focused exclusively for younger employees.

131. By using photos of young people (advertising its disproportionately young workforce), by promoting development programs for experienced workers (focused on young professionals) and by stating their desire to attract a youthful workforce via their benefits packages specifically targeted for younger workers, Maxim intentionally and willfully age discriminates against older workers in their hiring practices.

132. *The U.S. Supreme Court has held that the ADEA prohibits practices and policies that are seemingly neutral, but have a disproportionately negative impact on older workers (disparate impact), as well as those that explicitly treat older workers less favorably than younger workers (disparate treatment). (See Smith v. City of Jackson, Mississippi, 544 U.S. 228 (2005).*

133. "*The ADEA makes it unlawful for an employer to discriminate against employees on the basis of age. 29 U.S.C. § 623(a)(2).* " *Heath v. Google LLC, Case No. 15-cv-01824-BLF, 5 (N.D. Cal. Aug. 15, 2019)*

134. Maxim has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

135. As a direct result of Maxim's discriminatory policies and/or practices as described above, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

136. Maxim's foregoing policies, patterns, and practices have an unlawful disparate impact on applicants and prospective applicants ages 40 and older in violation of *29 U.S.C. § 623(a)(2)*.

137. .As a direct result of Maxim's willful and intentional discriminatory policies and practices described above, Lenk has suffered damages including, but not limited to, lost past and future income, compensation, diminished employment opportunities, humiliation, embarrassment and benefits.

138. Lenk is entitled to all remedies available for the *ADEA* violations including attorneys' fees, due to Maxim's illegal age discrimination.

## THIRD CLAIM FOR RELIEF

### California Fair Employment and Housing Act (FEHA)

### California Gov. Code § 12940

139. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

140. Lenk filed California Civil Rights Division complaint #*202108-14597127* (*EEOC # 37A-2022-00395-C*) to address the age discrimination

141. Lenk complied with the DFEH (and EEOC) administrate requirements for the California violations and obtained the *DFEH #202108-14597127* on November 14, 2022 and filed this complaint in a timely manner.

142. Lenk applied for numerous positions at Maxim, some of which were located (or collocated) in California and hence, subject to California law. California also maintains a strong public policy interest for its technology

employees and their rights therein. Plaintiff asserts that Maxim's applicant tracking system is located at their Headquarter location in San Jose, CA, which is being used to filter candidates. As a result of these filters, Maxim decides the age of employees to be considered for employment in California, a clear violation of California's public policy and fair competition laws.

143. Lenk is informed and therefore alleges that Maxim age discriminated against him in his application for employment in violation of *California Gov. Code § 12940(a)(d)(k):*

> *(a) **For an employer, because of** the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, **age**, sexual orientation, or military and veteran status of any person, to **refuse to hire** or employ the person or to refuse to select the person for a training program leading to employment.....*
>
> *(d) **For any employer** or employment agency to print or **circulate** or **cause to** be printed or **circulated any publication**, or to make any nonjob-related inquiry of an employee or applicant, **either verbal or through use of an application form, that expresses, directly or indirectly, any limitation**, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, **age**, sexual orientation, or military and veteran status, or any intent to make any such limitation, specification, or discrimination....*
>
> *(k) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to **take all reasonable steps necessary to prevent discrimination and harassment from occurring (emphasis** added).*

144. Maxim discriminated against Lenk, since Maxim hires significantly younger and less qualified workers instead of Lenk, due to his older age.

145. Maxim illegally uses age information obtained by college graduation dates, in the application, to discriminate against older candidates, as pled.

146. Lenk applied to other positions he was highly qualified for, such that Maxim could correct their age discrimination, but Maxim failed to *"take all reasonable steps necessary to prevent discrimination".* Instead, Maxim

1    took specific steps to further inhibit Lenk from obtaining several positions,
2    indicating their intentional and willful intent to discriminate.

3    147. Lenk alleges that he has and continues to suffer unemployment
4    because of Maxim's illegal age discrimination, in violation of the *California*
5    *Gov. Code, § 12940(a)(d)(k)* as alleged herein.

6    148. Maxim knew and showed reckless disregard for the fact that its illegal
7    conduct was in violation of the *California Gov. Code, § 12940(a)(d)(k)* Lenk
8    provided Maxim with numerous opportunities to correct their May, 2021,
9    Business Manager -- Automotive LED Lighting position violation, as well as
10   before and after via the other positions he was qualified for and applied to.

11   149. Maxim committed fraud, as their *"sincere consideration"* of Lenk for
12   several positions was bogus (based on the skills required for the position) and
13   inconsistent with the criteria used for other positions. Maxim committed
14   further fraud suggesting their applicant system was fair and just and instead
15   used the system to age discriminate (filter out) resumes favoring younger
16   applicants over those age 40 or older, using illegally obtained age data.

17   150. Maxim illustrates their malice and oppression by excluding Lenk for
18   the other roles he was qualified for by stating: *"Our team will keep your*
19   *resume on file for consideration at a later date should a suitable position*
20   *arise."* Maxim never considered Lenk for any other positions (as did their
21   industry peers) and instead, disqualified Lenk due to his age (despite their
22   parent company recognizing Lenk as qualified for the Product Line Manager
23   role pursuant to their prior offer letter (**EXHIBIT F**).

24   151. Maxim's industry peers found similar positions that Lenk was qualified
25   for and notified him (via email) of such, but Maxim never did, due to their
26   illegal age discrimination.

27   152. As a result of Maxim's willful and intentional age discrimination, Lenk
28   has and continues to suffer materially adverse harm, including, but not

1st AMENDED COMPLAINT FOR DAMAGES

1   limited to loss of career, lost wages/benefits, diminished employment
2   opportunities, humiliation and embarrassment.

3   153. By reason of Maxim's illegal age discrimination, Lenk is entitled to all
4   remedies available for violations of the *California Gov. Code, § 12940 et seq,*
5   including reasonable attorneys' fees, all compensatory damages, including
6   damages for emotional distress and punitive damages.

7   154. By reason of Maxim's conduct being done with malice, oppression,
8   and/or fraud, Plaintiff requests exemplary and/or punitive damages as
9   allowed by *California Civil Code § 3294(c).*

10

11   **FOURTH CLAIM FOR RELIEF**
12   **Arizona Civil Rights Act – Age Discrimination**
13   **(A.R.S. § 41-1463)**

14   155. Plaintiff incorporates all paragraphs of this Complaint as if fully set
15   forth herein.

16   156. Lenk complied with the Arizona's Civil Rights administrate
17   requirements via *EEOC complaint # 37A-2022-00395-C,* received his right to
18   sue letter on November 14, 2022, and filed this complaint in a timely manner.

19   157. Lenk is informed and alleges that Maxim age discriminated against
20   him in his application for employment at Maxim's Chandler, AZ location in
21   violation of *A.R.S. § 41-1463(B)(1): (B) It is an unlawful employment practice*
22   *for an employer (1) to fail or refuse to hire or to discharge any individual or*
23   *otherwise to discriminate against any individual with respect to the*
24   *individual's compensation, terms, conditions or privileges of employment*
25   *because of the individual's race, color, religion, sex, age or national origin or*
26   *on the basis of disability.*

27   158. Maxim, by their own admission, hired younger (and less skilled)
28   workers despite Lenk's better skill match for the position requirements.

159. Lenk alleges he has and continues to suffer unemployment because of Maxim's illegal activity, in violation of *A.R.S. § 41-1463* as alleged herein.

160. Maxim knew and showed reckless disregard for the fact that its illegal conduct was in violation of *A.R.S. § 41-1463*, as evident by their admissions in their response to the California Civil Rights Division complaint.

161. As a result of Maxim's willful and intentional age discrimination, Lenk has suffered and continues to suffer materially adverse harm, including but not limited to loss of career, lost wages, benefits, diminished employment opportunities, humiliation and embarrassment.

162. Lenk is entitled to all remedies available for the *A.R.S. § 41-1463* violations including attorneys' fees, due to Maxim's illegal age discrimination.

## **FIFTH CLAIM FOR RELIEF**

### CALIFORNIA UNFAIR COMPETITION LAW (UCL) VIOLATION

*Business & Professional Code § 17200*

163. Lenk re-alleges all the paragraphs of this Complaint as if fully set forth herein.

164. California Courts determined that age discrimination provides an unfair competitive advantage pursuant to: *Cal. Bus & Prof Code § 17200; Herr v. Nestle U.S.A., Inc., 109 Cal. App. 4th 779, 789-90 (2003)* (since older workers salaries are higher than younger workers).

165. Lenk asserts that Maxim favors younger workers over older workers to gain an unfair competitive advantage. This is unfair competition. Lenk further asserts Maxim favors lower cost H1B visa workers over older employees to obtain further unfair competitive advantages. According to www.h1bdata.org/employers/maxim-integrated-products-inc, Maxim *"has hired a total of 935 H1B Visa Employees as of 2022 across 7 locations, with the majority of hires in CA"*.

166. Maxim's actions interfere with fair markets and are anti-competitive:

*"Defendants' anticompetitive conduct also violates California's UCL. California Business & Professions Code § 17200 prohibits an individual or entity from engaging in an "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000)*

167. Maxim's age discrimination of Lenk was done for their own financial gain and is unfair competition as defined by *Cal. Bus & Prof Code § 17200*:

*"As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."*

168. Lenk is *"a person who has suffered injury in fact and has lost money or property as a result of the unfair competition"* Cal. Bus & Prof Code § 17204 and hence has standing per the requirements of *Section 17204* and complies with *Section 382* of the Code of Civil Procedure. Lenk would have been employed if not for Maxim's unfair competition.

169. Lenk has an *"ownership interest"* in the unpaid wages he would have obtained if not for Maxim's *unlawful, unfair or fraudulent business act* and seeks restitutionary relief pursuant to: *Cortez v. Purolator Air Filter Prods., 23 Cal. 4th. 163 (2000)*

170. Lenk requests injunctive, restitutionary, and other relief pursuant to *Cal. Bus & Prof Code § 17203* to *"restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.'*

171. As a result of Maxim's conduct alleged herein, of their willful and intentional unfair competitive practices, Lenk has suffered and continues to suffer materially adverse harm, including loss of career, lost wages / benefits,

diminished employment opportunities, humiliation, emotional pain, suffering, mental anguish, and loss of enjoyment of life.

172. Lenk requests costs and attorney's fees per *Cal. Civ. Code § 1021.5*.

### SIXTH CLAIM FOR RELIEF
### Civil action for Retaliation – SOX Whistle Blower
### 18 U.S.C. § 1514A

173. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

174. Maxim is a publically traded company (employer) and hence required to provide Whistle Blower protection pursuant to *18 U.S.C. § 1514A(a)*. Lenk is a person who alleges discharge or other discrimination by any person in violation of said subsection (a) seeking relief under *18 U.S.C. § 1514A(b)(1)*.

175. Lenk applied to Maxim's Senior / Executive Business Manager Position (R10389) on July 27, 2021 as noted prior in this complaint.

176. Approximately one month later, Lenk filed a SOX retaliation complaint **(EXHIBIT J)** on August 25, 2021 (by USPS First Class mail to the U.S. Department of Labor, OSHA, Phoenix Office, 800 W. Washington Street, 2nd floor Phoenix, Arizona 85007) for Maxim's refusal to hire him, within the reporting time period requirement.

177. The Secretary of Labor did not issue a decision within 180 days. Lenk is permitted to bring an action pursuant to *18 U.S.C. § 1514A(b)(B)* in an *"appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy."*

178. As noted in the SOX complaint, Lenk raised concerns to management/VP of Legal about misleading financial data and concerns against securities fraud (backdated stock options) which violates regulations of the Securities and Exchange Commission ("SEC").

179. Lenk engaged in protected activity, since he reported the concerns to Maxim's VP of Legal, Chuck Rigg. Since Mr. Rigg was the recipient of the emails and responded to such, he (and hence, Maxim) was clearly aware of the protected activity. Lenk initially received unfavorable personnel action (2005) and again in 2021 when Maxim refused to hire him for employment, due to his previous ethical reporting about illegal activity.

180. Lenk asserts that his previous reporting of illegal activity is a contributing factor for Maxim's refusal to hire. *"A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." Klopfenstein v. PCC Flow Techs. Holdings, Inc., ARB No. 04-149, 2006 WL 3246904, at \*13 (DOL May 31, 2006)).*

181. While Maxim's Mr. Schemansky's age discrimination comment: ***"It was a Jr. BM position and we extended an offer to a young candidate"*** (**EXHIBIT B**) strongly suggested age discrimination, it is likely pretext to protect against Maxim's true SOX retaliation motive, especially since Lenk was qualified for all the roles he applied for.

182. Lenk asserts that his prior reporting of backdated stock options, as well as concerns about ethical (correct) reporting of financials are strong contributing factors for Maxim's refusal to hire him for employment.

183. *"In proving that protected activity was a contributing factor in the adverse action, a complainant need not necessarily prove that the respondent's articulated reason was a pretext." See Henderson v. Wheeling & Lake Erie Railway, ARB No. 11-013, ALJ No. 2010-FRS-12 (ARB Oct. 26, 2012) (citing Klopfenstein v. PCC Flow Techs. Holdings, Inc., ARB No. 04-149, ALJ No. 2004-SOX-011, slip op. at 18 (ARB May 31, 2006)). "A complainant can prevail by showing that the respondent's reason, while true, is only one of the reasons for its adverse conduct and that another reason was the complainant's protected activity." Klopfenstein, ARB No. 04-149 at 19.*

184. _Lenk is entitled to all remedies available under 18 U.S. Code § 1514A(c)(2): Compensatory damages.—Relief for any action under paragraph (1) shall include— (A)reinstatement with the same seniority status that the employee would have had, but for the discrimination; (B)the amount of back pay, with interest; and (C)compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees._

185. Lenk requests to be made whole for damages to his reputation based on: _Mahony v. KeySpan Corp., No. 04 Civ. 554 (SJ), 2007 WL 805813, at *1 (E.D.N.Y. Mar. 12, 2007) "When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [they] cannot be made whole without compensation for the lost future earnings [they] would have received absent the employer's unlawful activity."_

186. The company's Directors may also be held individually liable under SOX as agents of the company. _See Jones v. Southpeak Interactive Corp. of Delaware, 777 F.3d 658, 675 (4th Cir.2015); Wadler v. Bio-Rad Labs, Inc., No. 15-cv-02356-JCS, 2015 WL 6438670 (N.D. Cal. Oct. 23, 2015). See also Section 1513 of title 18, U.S.C. (e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both._

## SEVENTH CLAIM FOR RELIEF
## Violation of whistleblower employment anti-retaliation provisions
## SEC Section 21F (h) (Dodd-Frank CPA)

187. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

188. Maxim is a domestic, publicly traded company with more than 500 shareholders and $10 million in assets, and is subject to Dodd-Frank.

189. Plaintiff is a *"whistleblower" "who provided information relating to a violation of the securities laws" 15 U. S. C. §78u– 6(a)(6).*

190. Plaintiff believed that Maxim was violating securities laws (backdating of stock options, disingenuous financial forecasts) as evident by several communications with Maxim's VP of Legal, Chuck Rigg at times relevant. *Allen v. Admin. Review Bd., 514 F.3d 468, 479 (5th Cir. 2008).*

191. Plaintiff *"believed the conduct complained of constituted a violation of pertinent law." Day v. Staples, Inc., 555 F.3d 42, 54 n.10 (1st Cir. 2009).*

192. Plaintiff is protected from employment discrimination (refusal to hire) retaliation *see §78u–6(h)(1)(A)(i)–(iii).*

193. Dodd-Frank permits a whistleblower to sue an employer directly in federal district court *§78u–6(h)(1)(B)(i), (iii)(I)(aa).*

194. As a result of the conduct described above, Maxim violated *Section 21F(h) of the Exchange Act,* which prohibits an employer from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower.

195. Plaintiff requests double back-pay with interest pursuant to *§78u–6(h)(1)(C)(ii),* and compensation for litigation costs, expert witness fees, and reasonable attorneys' fees pursuant to *§78u–6(h)(1)(C)(i), (iii).*

1

2 **JURY DEMAND**

3 196. Lenk demands trial by jury for this complaint, pursuant to FRCP 38.

4

5 **PRAYER FOR RELIEF**

6 197. WHEREFORE, Plaintiff respectfully prays for:

7 198. Compensation for all injury and damages suffered by Lenk, including,

8 but not limited to, both economic and non-economic damages, in an amount

9 proven at trial including back pay, front pay, pre/post judgment interest, lost

10 benefits of employment, adverse tax consequences, investment loss,

11 liquidated damages under Federal, California and Arizona law for willful

12 violations, exemplary damages, and general damages relating to emotional

13 distress and mental anguish damages as provided by law.

14 199. Plaintiff's reasonable attorneys' fees, expert fees, and costs, as provided

15 by law, as well as the private attorney general theory of recovery of

16 reasonable attorneys' fees and costs in employment related cases.

17 200. Exemplary and/or punitive damages per *California Civil Code § 3294*;

18 201. Order Maxim to eradicate the effects of their unlawful practices;

19 202. Grant all other relief as the Court may deem just and proper.

20

21 Respectfully submitted,

22

23 DATED this 04th day of August, 2023        /s/ Kenneth Lenk
Kenneth Lenk, pro se
24                                            3310 South Buckskin Way
Chandler, AZ 85286
25                                            (215) 668-8136
26                                            ken_lenk@yahoo.com

27

28

# EXHIBIT A



**INTEROFFICE MEMO**

**TO:**      Peter Sharrock

**FROM:**   Peter Cornelius / Maxim Applications

**RE:**      Annual Review for Ken Lenk

**DATE:**   6 March, 1998

---

Peter,

Here are my inputs for Ken's first annual review. Ken is providing good technical support to customers, visits customers well prepared and is a good team player. Working mostly out of our local Philadelphia office, he is a valuable resource to the sales team. He likes to teach / pass-on knowledge and is always ready to help out in the office if the computer is down. With sales leads, he takes initiative and follows up. Most notably, he provides phone support for some of the central regions as a stopgap measure in the absence of adequate FAE coverage. He is well aware of the respectable size of the companies involved and optimizes his time with the potential business in mind. To improve efficiency, he has purchased his own computer and other office equipment. Visiting customers, he has does the research beforehand. In the meeting, he is very personable, listens and communicates well. Almost with us for one year, he is quite familiar with all but the more challenging products. Retrieving and processing customer information will become better with exposure. High average goal score of 94%.

In short, I predict a bright future for Ken Lenk. Selected highlights:

- Provided well received sales training and prepared technical presentations for special occasions
- Provides extra phone support to bigger accounts outside his area (AM Bob Bloomquist)
- Purchased own office equipment to be more efficient

*Conference Calls:* Scores highest, intimate technical knowledge of accounts

*Customer Visits:* Well organized. Good communicator. Needs more practice in front of customer.

*Overall Impression:* Good

*Areas for Improvement:* Improve product knowledge of our more sophisticated or exotic parts. Spend more time in front of customers to become more seasoned.

*Creativity:*   (good)              18/25    — always meets his new product proposals good.

*Effort:*       (average to good)   15/25    (6 for working hours, 9 for focus & efficiency)

Let me know if you need more information.

Regards



# MAXIM
### INTEROFFICE MEMO

**TO:**        Peter Sharrock

**FROM:**    Peter Cornelius / Maxim Applications

**RE:**        Annual Review Ken Lenk

**DATE:**    1 March, 1999

Peter,

Here are my inputs for Ken Lenk's second annual review. Ken continues to provide excellent technical support. His territory and the size of his projects have grown significantly over the past year. He has become de-facto the automotive FAE and established good rapport with large customers in the Detroit area. Ken is quite aware how he spends his time and typically has a good business sense where to put the effort. Being a good team player, he has made himself almost indispensable in the Philadelphia office. He spent some time maintaining the ailing office computer over the course of last year. In general, he likes to interface with the sales team and enjoys the training aspect. Ken also started a self-study program to familiarize himself better with our HF offering. Ken consistently submits more product proposals than requested.

Ken has almost outgrown the typically smaller projects in his local Philadelphia area and is clearly well suited pursuing and supporting bigger accounts in the Michigan area. What started as a stopgap measure in the absence of a local FAE has resulted in good customer relations.  + no complaints from McGill

| | |
|---|---|
| *Conference Calls:* | Good scores, knows his accounts |
| *Customer Visits:* | Well prepared, leads meeting, cordial but determined |
| *Overall Impression:* | Excellent |
| *Areas for Improvement:* | Possibly spend less time assisting sales other than in an emergency situation. Relocate closer to bigger business ? |
| *Creativity:* | (Good)                                        18/25 |
| *Effort:* | (Effort above av. 8/13, Effic. good 9/12)   17/25 |
| *Goals:* | Exceeded four straight quarters. |

Let me know if you need more information.

Regards
Peter C.

— News Are Inc
— curp title  ( grop + field apps title)

09/30/1999   11:00   1-408-222-1714                    PETER C                              PAGE  01

# MAXIM

**INTEROFFICE MEMO**

30 Sep 99

**TO:** All Director Level and Above

**CC:** Personnel

**FROM:** Peter Cornelius, US Field Applications Engineering

*Hello Ken —*
*thought you should see*
*this first.*
*Regards*
*PC*

---

**RE:** **Promotion**

---

**DATE:** 1 October 1999

I am pleased to announce the promotion of Ken Lenk to the position of Manager, US Field Applications Engineering, South Eastern Region. Ken joined us 2 ½ years ago as a Field Applications Engineer stationed in Philadelphia, having been an engineering manager with his previous employer. Ken has provided outstanding technical customer assistance in the Mid Atlantic and Mid Central regions. In his role as an CFAE, Ken has been instrumental in identifying and securing automotive opportunities in Michigan.

Ken's group will include all Standard, Wireless and future Fiber FAEs. Reporting to Ken presently are Greg Sutterlin, Jim Christensen, Gene Carey, Richard Gay and Kevin Mays. It's no surprise that Ken will focus on recruiting in his region first.

Please welcome Ken transitioning into his new role.

Regards

*Peter Cornelius*



06/01/2000  13:23    1-408-222-1714           PETER C                        PAGE  06

# MAXIM

## INTEROFFICE MEMO

TO:        Peter Sharrock

FROM:    Peter Cornelius / Maxim Applications

RE:        Annual Review Ken Lenk

DATE:    13 April 2000

---

Peter,

Ken was promoted last year to FAE manager in addition to his role as CFAE Automotive. It took him less than a quarter to find his groove. At this point, I am impressed how well he manages his group. Overall, he is thinking ahead and delivers consistently good output. His management style is clear-cut and direct.

Besides his managerial role, he also continued to successfully cover local accounts and provided valuable CFAE inputs.  Tom Sparkman is satisfied with his CFAE performance. His initiative to go after the keyless entry market has proven to be very valuable.  Ken has developed a good sense for the business and how to succeed within our organization. Goals scores above average eight quarters.

| | |
|---|---|
| *Conference Calls:* | Good customer knowledge |
| *Customer Visits:* | Asks probing questions, good follow-up |
| *Overall Impression:* | Excellent FAE and manager |
| *Areas for Improvement:* | Nothing noteworthy. By his own admission, budgeting his time more effectively |
| *Creativity:* | ( good)                                        19 /25 |
| *Effort:* | (Effort high  10/13, Effic. Good 9 /12)      19 /25 |
| *Goals:* | Exceeded     98.2/87.1, 95.5/89.6, 100/84.4, 97.2/83.5 (manager scoring) |

Let me know if you need more information.

Regards

Peter C

# MAXIM

## INTEROFFICE MEMO

**TO:**      Peter Sharrock

**FROM:**   Peter Cornelius / Maxim Applications

**RE:**      Annual Review Ken Lenk

**DATE:**    16 April 2001

*Salary 106k*
*bonus 18k*
*stock 3k*

---

Peter,

Ken settled in successfully in his second year as a manager. He handed off his FAE duties to a newly hired person and continued to contribute significantly in his CFAE assignment.

Using all tools available to him (close ties with sales, internet recruiting, newspaper ads and going through contact lists from trade shows) he was able to fill all requested positions in his area. Over the course of last year, he hired  Warzecha (Jun 00),  Crandall (Sep 00), Schemansky, Lyon (Nov 00) and Gustafson (Jan 01). With the exception of Gustafson, all new hires have become valuable FAEs.  With hands-on coaching and working through issues with sales and business management he improved the efficiencies of both Mays and Gay. His monthly audits are very complete and potential problems are being flagged to HQ early.

He is well respected with his direct management style. For example, when Ken's father recently passed away, Greg Sutterlin immediately volunteered to get all signatures on a card for his family.

*Overall Impression:*        As his manager, I can rely on him to get the job done. Ken is cost conscientious, pro-active and anticipates. He has scored above average now for more than 12 quarters. Without hesitation, we recommend to promote Ken to director level.

*Areas for Improvement:*       Nothing significant with the exception to take time off on a more regular basis to recharge. Plans are under way to reduce his 200 hour plus vacation time by October.

| | | |
|---|---|---|
| *Creativity:* | ( very good ) | 20 /25 |
| *Effort:* | (Effort high  10/13, Effic. High  10 /12) | 20 /25 |
| *Goals:* | Exceeded (three years straight) 86.3/78.8,  94.6/81.5,  95.5/78.0,  99.2/78.9 | |
| Bonus: | 50% Cash, 50% Stock | |

Let me know if you need more information.

Regards

*Peter C*

06/04/2002 11:59   1-408-222-1714          PETER C                    PAGE 14

# MAXIM

**INTEROFFICE MEMO**

**TO:**       Peter Sharrock

**FROM:**    Peter Cornelius / Maxim Applications

**RE:**      Annual Review Ken Lenk

**DATE:**    12 April 2002

Peter,

Ken logged a third year managing a group of now eleven. His performance is consistent with a director level position. For reasons outside our control, his promotion was held back. We are working on having the loop closed at the time of his review. His relocation has been approved since last fall. For the coming year, we hope that Ken will be closer to his team with increased efficiency and less travel time.

Ken spent a significant portion of the review year coaching and training his mostly newly assembled team. His monthly audits set the standard in the US. He follows up promptly with personnel issues and is in close communication with the regional sales managers at all times.

- Kevin Mays was not considered a significant contributor in his business unit (wireless) last year. Through continuous coaching and micro-managing, Ken was able to completely turned around performance and conception. Attached are two testimonials from wireless BMs.
- Underperformer Richard Gay has significantly improved through periodic reviews and audits.
- Ken continues to be contributing member of the SSIP CFAE team with 20%. (Attached from Tom S.)
- In his well-executed audits, FAEs are polled and encouraged monthly for article or design ideas. As a result, his group's article and design idea contributions over the last year have raised the bar in the US.
- FAE Briggs needs to further grow into his Maxim role. It would be beneficial to have Ken Lenk working out of the same office in Dallas.

*Overall Impression:*   Dedicated and reliable team worker. Creative in finding a positive solution in times of budget cuts and travel restrictions. His actions are bottom line oriented. Thinks ahead/anticipates.

*Areas for Improvement:*     Maxim #13: "Take direction enthusiastically once a decision is reached." This is also valid for a delayed decision, such as your promotion. We understand your situation and appreciate your patience. No other area of improvement is noteworthy.

**Creativity:**       ( High)                          20 /25

**Effort:**           (Effort  good 9/13, Effic. excellent 11/12)   21
                                                      20 / 25

**Goals:**            Four + (16 quarters straight !)  86.9/82.6,  97.2/84.8,  94.4/86.5, 92.1/84.0

**Bonus:**            Cash

Let me know if you need more information.

Regards, *Peter Cornelius*

# EXHIBIT B

# LinkedIn Conversation -- Kenneth Lenk & Kevin Schemansky of Maxim
## (photos removed, formatting changed)

- **MAY 18, 2021** Ken Lenk sent the following message at 1:05 PM

  Ken Lenk 1:05 PM

    Hi Kevin, Saw you have a BM role here in Chandler for Led lighting. Any idea if the pay range for this? Thanks in advance, Ken

- Schemansky Kevin sent the following message at 1:23 PM

  Schemansky Kevin 1:23 PM

    I'm asking my BM.  I don't have it handy.  How are things?

- **MAY 19, 2021** Ken Lenk sent the following messages at 8:38 PM

  Ken Lenk 8:38 PM

    Doing well (as are most Chandler home buyers), thanks for asking. Hope you are as well. Just saw the F150 Lightning announcement and thought this would be on your short list, if you still are a Ford guy.

- **MAY 27, 2021**

  Ken Lenk 12:39 PM

    Any feedback from your BM? I suspect it is probably around $130k, though that assumes the old stock option days..

- Schemansky Kevin sent the following message at 3:12 PM

  Schemansky Kevin 3:12 PM

    sorry.....just getting to this....I am OOO this week as I sold my lake house in Brighton MI today.   It was a Jr. BM position and we extended an offer to a young candidate.

# EXHIBIT C

# Phone Interview Confirmation with Infineon Technologies Americas

From: ifamservicecenter@infineon.com

To: ken_lenk@yahoo.com

Cc: ifamservicecenter@infineon.com

Date: Friday, August 20, 2021, 10:24 PM MST

Dear Kenneth,

Your phone interview for the position of **Sr. Product Marketing Manager, Power Management ICs** has been confirmed for **August 25, 2021 at 11AM PDT** with Rakesh Renganathan, (Director, Product Marketing). Rakesh will call you at the designated time at **(215) 668-8136.** Prior to your interview, please complete the attached application, and return it to IFAMServiceCenter@infineon.com.

Please confirm your acceptance of these arrangements by reply.  Feel free to let us know if you have any questions. Have a great day!

Best regards,

**Ron Rhaburn**

HR Service Center Coordinator

101 N. Pacific Coast Highway, El Segundo, CA 90245

Tel (internal): 88188

Tel (external): +1 310-726-8881
Email: IFAMServiceCenter@infineon.com



**People** create value.
**HR** fosters people engagement.

Do you have questions on HR services?

Please have a look at our EasyCards!

**Infineon Technologies Americas Corp.**
www.infineon.com

NOTICE: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material of Infineon Technologies AG and its affiliated entities which is for the exclusive use of the individual designated above as the recipient. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact immediately the sender by returning e-mail and delete the material from any computer. If you are not the specified recipient, you are hereby notified that all disclosure, reproduction, distribution or action taken on the basis of this message is prohibited.

# EXHIBIT D

# KENNETH LENK

ken_lenk@yahoo.com                                                          Cell: (215) 668-8136

Linked-In profile: http://www.linkedin.com/pub/ken-lenk/4/aab/aa8

---

### Semiconductor Business and Application Engineering Professional

**Innovative thinker with keen business acumen and proven abilities in business management, application engineering, product definition, marketing, manufacturing, test and business startups.**

High integrity, energetic leader known to anticipate market trends and for creative semiconductor solutions to maximize revenue. Diverse analog, uC, power, RF, sensor, MEMS and functional experience with a tenacious commitment for profit and market share growth. **Areas of excellence include:**

| | | |
|---|---|---|
| P&L Management | High Growth Business Plans | International Sales |
| New Business Development | Strategic Alliances | Contract Negotiations |
| Product Definitions/Roadmaps | Go to Market Strategies | Team Development |
| Consumer, Mobile & Automotive Sales | IP Development | Remote Management |

---

## PROFESSIONAL EXPERIENCE

**MONOLITHIC POWER SYSTEMS; San Jose, CA**                                          2012-2013
**Marketing Director – Automotive and Industrial -** DC/DC, POL, USB, PMICs, LED & LCD ICs

Recruited from Intersil to grow the automotive, industrial, white good and, medical markets. Provide strategic and tactical marketing support as well as technical support. Responsible for product from initial conception to final marketing release, including team partnerships with the application engineering, test, product engineering, packaging and sales groups.

- Achieved 93% year/year growth (with GM>70%) by providing sales/FAE/new product introduction and adjusting product specifications/features to improve market acceptance
- Developed $100M business plan with product roadmap/strategy/part definitions to drive >60% CAGR
- Created strategic customer relationships for a wireless charging, Blue-Tooth Low Energy ASIC
- Produced Market Requirement Documents (MRDs) and Product Requirement Documents (PRDs/product definitions) for standard and AEC-Q100 products
- Company liaison for the Automotive Electronic Counsel (AEC) technical committee

**INTERSIL CORPORATION; Milpitas, CA**                                              2010-2012
**Automotive Product Marketing Manager -** Mixed Signal, Analog and Power Semiconductors

Provided tactical and strategic marketing support for analog and power products including ultra-high performance Li-Ion cell balancing solutions for hybrid and battery vehicles.

- Developed product line strategies, business plans and roadmaps/part specifications for Automotive ICs – Li-ion battery management (ISO26262), FET driver, class D Audio, LED, LCD Display, DC/DC, multiphase & isolated power; secondary responsibility for consumer and industrial multi-cell Li-ion battery management and chargers
- Created price strategies, promotional materials and created marketing literature -- product profiles, product releases, selector guides, FAE training presentations, customer presentations
- Developed world-wide (Europe, US, Asia/Japan) relationships with key automotive customers including a strategic relationship for a high efficiency 3200 watt DC/DC power convertor development

FREESCALE SEMICONDUCTOR; Tempe, AZ                                          2005-2009
**Sensors Operations Manager –** Pressure, Accelerometer & Capacitive Sensors
**Strategy Director for Analog & Sensors -** Microcontroller, Mixed Signal, Analog and Power

Provided strategic support for the $600+M analog/sensor division initially, then promoted to the Consumer and Industrial Sensor Operation Manager to develop a new line of business from inception. This involved recruitment and team building, including management of remote international locations.

- Developed product line strategies/roadmaps and part specifications for the consumer analog and sensor business units; managed product definition and strategy team
- Increases sales 211% from $35M to $74M (2006 to 2008)
- Created/staffed/managed the 60 person Consumer and Industrial Sensor Group; managed P&L, marketing, product development and application engineering; managed world-wide Go To Market
- Created strategic business plans for existing and new product lines; provide technical & financial analysis of analog/sensor companies for possible acquisition
- Developed partnerships with industry leaders in the consumer & cellular market for long term growth strategy, (PMICS/Sensors for Sony DSC/gaming, Guitar Hero, Nokia, Motorola, Samsung)
- Assessed new sensor technologies for development of a cellular sensor cluster (9 axis uC based IMU) including MEMS microphone, fingerprint (capacitive), camera sensor, electronic compass (magnetic) & Hall effect sensing. Developed/investigated strategic partnership for read/write heads to expand product line SAM
- Created business, product & marketing plans for Magnetic Random Access Memory (MRAM) products (Everspin company sold off from Freescale)

MAXIM INTEGRATED PRODUCTS; Various Locations                                1997-2005
**Director of Business Management for Silicon Subsystems; Sunnyvale, CA**    2004-2005
**FAE Regional Manager/FAE/Product Definer; Philadelphia PA/ Dallas, TX**    1997-2003

Provided FAE support to mid-Atlantic region initially, with expansion into the north central region.  I became Maxim's first automotive FAE and product definer. Promoted to FAE manager and relocated to Dallas. I left Maxim in 2003 to start a new semiconductor business at Tyco and was rehired in 2004 as a Director of Business Management.

- Directed $25M operation – LED driver, temperature sensor, system/fan controllers, motor drivers, solid state oscillators & SERDES; created business and strategic plans; advertising, merchandising and internet plans; product literature, training and presentation materials
- Managed product definition, launch schedules and prioritized engineering resources
- Managed 11 remote FAEs – power/wireless/analog/fiber & telecom in the central/south east US for cellular, computer, automotive and medical markets for greater than $500M of project value
- Responsible for product design-ins for the north central and mid-Atlantic regions, provided technical sales support/training, customer training/presentations; created product definitions
- Launched Maxim's automotive thrust - 1st automotive FAE and product definer; created part definitions for TPM/RKE, signal conditioning, power management, audio and other analog products for the automotive, white good, computer, industrial and consumer markets

Tyco Electronics (Raychem); Menlo Park, CA                                  2003-2004
**Business Unit Manager -** Power Products - LED Drivers, USB, Battery, Portable & Off-Line Power

Recruited from Maxim to start up a semiconductor business unit to counter the ASP decline in Raychem's PPTC products. Developed $50M business plan (55% GM fab-less model) with large key customer support (HP, Compaq, Dell). Managed 13 persons locally and a remote design group (8 persons). Returned to Maxim since Raychem did not have Tyco's support to increase back-end necessary to grow business.

## EARLY CAREER

**Redwood Microsystems; Menlo Park, CA**
**Field Application Engineer Manager**
Provided world-wide field application support for MEMS micro-valve start-up. Developed two strategic customer relationships and providing marketing and eastern US region sales support as needed, including managing representatives and distribution.

**Siemens (Moore Products Company); Springhouse, PA**
**Design Engineer/Manufacturing Supervisor/Product Marketing Manager**

Developed microprocessor based measurement and process control electronics including precision analog circuitry and power controls. Promoted to lead manufacturing/test operations for production of same ($35M/yr). Also lead product definition/marketing/development of industry leading, ultra low power, microprocessor based valve positioner.

**American Electronic Labs; Lansdale, PA**
**Technician to Assistant Engineer (University Co-operative position)**

Tested product antenna and developed prototype antenna for military systems. Products ranged from LF 1 MHz log periodic antenna to 30+ GHz phased array systems for tissue analysis (for Johns Hopkins as an alternative to-MRI). Possessed Department of Defense security classification.

## EDUCATION, TRAINING & PATENTS

**BSEE - The Pennsylvania State University, State College, PA**

**MBA Marketing (75% complete, all core) – Temple & Saint Joseph University, Philadelphia, PA**

Learning International's professional selling skills III, Lehigh University ASIC design, Just in Time & Kan-Ban manufacturing, Motorola 68000 uP design, Environmental Stress Screening, Quality Functional Deployment, Total Quality Management, Manufacturing Resource Planning, ISO9001; Myers-Briggs ENTJ personality; SAE & AEC technical committee member

**Patents & Invention Disclosures –** Low quiescent linear/PFM/PWM buck regulator (8,552,703), USB Switching Charger with OTG boost supply, Li-ion solar charger with USB charger, USB buck regulator with adjustable current limit, USB boost regulator with adjustable current limit,  accelerometer tap/gesture learning engine, sensor based activity dependent wake-up, integrated Read/Write head; integrated oscillator/resonator with sensor, uC and transceiver, integrated magnetometer with sensors, accelerometer based LED backlight control (cellular), edge enabled power supply, spread spectrum LED driver, LED driver with temperature measurement, resonant tag tire pressure monitoring system

**Product Awards -** EDN Innovations contenders – MPR03X proximity sensors, MMA7260 3 axis accelerometer; EDN 2009 China Innovation award - MMA7660FC; 2010 EDN China Innovation Award for Best Product (Sensors) – MMA8450Q; EDN Hot Products of 2011 – ISL78228; 2012 Embedded World Award & 2012 EDN China Innovation Award for Best Product (Sensors) – MPL3115A

# EXHIBIT E

## Correspondence from Maxim Integrated Products

From:  maxim-ic@hrsmart.com

To:      ken_lenk@yahoo.com

Date:  Tuesday, July 21, 2009, 09:04 AM MST

Thank you for submitting your resume to the Senior Applications Engineer at Maxim Integrated Products.

Your resume will be reviewed, and if you are selected for further consideration for this position, you will be contacted.

Each job posting on the Maxim web site is linked to the specific hiring process for that position. So, we encourage you to maintain an active search on the Maxim web site by applying to each job posting that is of interest to you and that you are qualified for.

We thank you for your interest in Maxim Integrated Products, and best wishes in your job search.

Maxim Integrated Products

**RE: Howdy!**

From:  ken lenk (ken_lenk@yahoo.com)

To:    John.Wettroth@maxim-ic.com

Date:  Sunday, May 9, 2010, 10:24 AM MST


Hi John,

I thought SSIP was the clearing house (at least when I was there)...

Thanks for the update and the offer for circulation. I did note that Maxim is selectively hiring. Toward that, I also applied (indirectly) for a PLM in Chae Lee's group for Portable Power Management, as I have spend some time in the past few years with Nokia (with accelerometers for their cell phones).

FYI, given that MXIM was kind with stock options previously, I am a bit particular on career choices and appreciate your opinion on selective forwarding of my resume .

Thanks again for you help. I hope you have a great time at the sales conference!

Ken


--- On **Sat, 5/8/10, John Wettroth <_John.Wettroth@maxim-ic.com_>** wrote:

> From: John Wettroth <John.Wettroth@maxim-ic.com>
> Subject: RE: Howdy!
> To: "ken lenk" <ken_lenk@yahoo.com>, "jwet@mindspring.com" <jwet@mindspring.com>
> Date: Saturday, May 8, 2010, 10:03 AM
>
> Hi Ken,
> Nice to hear from you.  I too miss the cigars and scotch.  I'm on my way to a sales conference that starts next week speaking of such.
>
> I'll circulate your resume- the CTO office is sort of a central clearing house for a lot of stuff going on in the company- Maxim is hiring but I'm not actively looking for anyone personally.
>
> Best regards,
>
>
> John M. Wettroth, Managing Director
> Office of the CTO
> Maxim Integrated Products- Innovation Delivered
> BB Cell: (919) 924-4984   O: (919) 303-5733
>
>
> From: ken lenk [mailto:ken_lenk@yahoo.com]
> Sent: Saturday, May 08, 2010 12:43 PM
> To: jwet@mindspring.com
> Subject: Howdy!
>
> Hi John,
>
> I was speaking with Tim Herklots yesterday, in which he mentioned that there may be an technology position in your CTO office.

I have attached a resume toward this. Please let me know if you think if I am a good match (I miss the cigars/scotch with you and Mike Quinn).

Thanks for your time. My best wishes for your continued success at Maxim.

Best regards,

Ken

## Correspondence from Maxim Integrated

From:  maximintegrated@hrsmart.com

To:    ken_jenk@yahoo.com

Date:  Thursday, February 6, 2014, 09:26 AM MST


Thank you for submitting your resume to the Director Systems and Applications Engineering at Maxim Integrated Products.

Your resume will be reviewed, and if you are selected for further consideration for this position, you will be contacted.

Each job posting on the Maxim web site is linked to the specific hiring process for that position. So, we encourage you to maintain an active search on the Maxim web site by applying to each job posting that is of interest to you and that you are qualified for.

We thank you for your interest in Maxim Integrated Products, and best wishes in your job search.


Maxim Integrated Products

## Correspondence from Maxim Integrated

From:   maximintegrated@hrsmart.com

To:      ken_jenk@yahoo.com

Date:   Thursday, February 20, 2014, 09:44 AM MST


Thank you for submitting your resume to the Business Manager (Product Marketing Manager) at Maxim Integrated Products.

Your resume will be reviewed, and if you are selected for further consideration for this position, you will be contacted.

Each job posting on the Maxim web site is linked to the specific hiring process for that position. So, we encourage you to maintain an active search on the Maxim web site by applying to each job posting that is of interest to you and that you are qualified for.

We thank you for your interest in Maxim Integrated Products, and best wishes in your job search.


Maxim Integrated Products

## Correspondence from Maxim Integrated

From:  maximintegrated@hrsmart.com

To:  ken_lenk@yahoo.com

Date:  Tuesday, March 3, 2015, 08:34 PM MST

Thank you for submitting your resume to the Director of Business Management at Maxim Integrated Products.

Your resume will be reviewed, and if you are selected for further consideration for this position, you will be contacted.

Each job posting on the Maxim web site is linked to the specific hiring process for that position. So, we encourage you to maintain an active search on the Maxim web site by applying to each job posting that is of interest to you and that you are qualified for.

We thank you for your interest in Maxim Integrated Products, and best wishes in your job search.

Maxim Integrated Products

## Re: Director of Applications Power

From:  ken lenk (ken_lenk@yahoo.com)

To:    vtailor1@comcast.net

Date:  Monday, May 11, 2015, 02:51 PM MST

Thanks for the prompt reply. The description had the Maxim style to it.

I am interested and was a previous Maxim employee (Dir of FAE and BM).

I'll send you an update resume this evening.

Ken

---

**From:** Vijay Tailor <vtailor1@comcast.net>
**To:** 'ken lenk' <ken_lenk@yahoo.com>
**Sent:** Monday, May 11, 2015 2:50 PM
**Subject:** RE: Director of Applications Power

Hi Ken. They have not given me that info

Positions are at Maxim in San Jose.  Should be a lot of RSU's and yearly bonus along with Base so I expect it to pay well.  The RSU and Bonus are worth a good amount there

Vijay

**From:** ken lenk [mailto:ken_lenk@yahoo.com]
**Sent:** Monday, May 11, 2015 5:47 PM
**To:** Vijay Tailor
**Subject:** Re: Director of Applications Power

Hi Vijay,

Positions are interesting., any rough comp guidelines?

Ken

---

**From:** Vijay Tailor <vtailor1@comcast.net>
**To:** ken_lenk@yahoo.com
**Sent:** Monday, May 11, 2015 1:57 PM
**Subject:** Director of Applications Power

You may have friends for this

Public Company in the Bay area has Director of Applications opening.   Power Management.   2 openings listed

Please also pass to your friends

Vijay Tailor
800 741 7987
vtailor1@comcast.net

# Director of Systems Architecture

looking for a Director of Systems Architecture with experience in power management products for hand held applications. The successful candidate will have in depth system expertise and knowledge of software development for smartphones and other handheld and mobile applications.

The candidate will be responsible for researching and defining power management ICs, and will work closely with customers system engineering, hardware and software teams to help define and use 's power management products. We are looking for someone who has close working relationships with our key customers and can understand the needs or a technical problem a customer faces, and can propose a product that can solve that problem. The candidate will be responsible for taking the proposed IC product concept and producing a Product Definition. This document serves two functions; first, it must supply all technical requirements needed to design the product and second, it must justify why this product will 'win' in the marketplace. In preparation of this document, the Product Definer works closely with the customer, Design, Business Management, Sales and our Field Applications organization.

The Director of Systems Architecture is a new role in Handheld Power Business unit at . It combines the expertise and responsibilities of a product definer with in depth system level knowledge in mobile applications to help anticipate future application needs to drive highly innovative product definitions and to establish credibility and deep rooted relationships with the customer. The successful applicant will become part of a close-knit winning team.

Responsibilities:
1- Listen, fully understand and anticipate the needs of our current and prospective customers.
2- Produce and maintain system level block diagram and identify key system level problems and product opportunities for .
3- Produce Product Definition documents.
4- Work closely with design, business management, sales management and the customer throughout the product development process to ensure product development and customer's engagement remains on track.
5- Evaluate products in the lab and provide technical support to design in the products at tier 1 customers.
6- Communicate with the rest of the  team so that everyone is fully informed.
7- Work with Business Management and Design to assure we have both a solid business case as well as a sound technical solution.
8- Define a product roadmap and ensure that we have a plan for sustainable differentiation in each product category.
9- Research competitive solutions and devise better ones.
10- Creatively solve customer problems; avoid non-competitive 'me-too' approaches.
11- Author preliminary 'paper tiger' data sheets.
12- Create and deliver compelling, targeted customer presentations.

Requirements:
1- MSEE along with at least 10 years of related experience
2- Experience and detailed knowledge of Power Management ICs for handheld applications including cellular phones, smart phones, tablets, wearables and other portable consumer equipment.
3- Experience in proposing, defining and developing Power management IC products.
4- Intimate knowledge of various regulator architectures.
5- Expertise in using lab equipment to debug and evaluate power management products.
6- Ability to understand the customers' problems and needs, and to propose a solution.
7- Excellent verbal and written communication skills.
8- Demonstrated ability to work within a cross-functional team.
9- Demonstrated ability to self-manage, and meet deadlines.
10- Knowledge of Tier 1 handheld customers in North America is a must.
11- Mobile phone system architecture knowledge is a must.
12- Knowledge of applications processors, Communications RF sub systems, MEMS, sensors and audio functions
13- Knowledge of mobile phone interfaces (I2C, I2S, MIPI/Slimbus, 1-wire)
14- Knowledge of SW and FW development processes

WE ALSO HAVE:

# PRODUCT DEFINER

Corporate Application Engineer/Product definer with experience in power management products for hand held applications. The successful candidate will be responsible for researching, defining, and evaluating power management ICs, and will also work closely with the field to support end customer engineering teams using PMICs. We are looking for someone who can understand the needs or a technical problem a customer faces, and can propose a product that can solve that problem. The candidate will be responsible for taking the proposed IC product concept and producing a Product Definition. This document serves two functions; first, it must supply all technical requirements needed to design the product and second, it must justify why this product will 'win' in the marketplace. In preparation of this document, the Product Definer works closely with customers, Design, Business Management, Sales and our Field Applications organization.

Duties and Responsibilities:

- Listen. Fully understand the needs of our current and prospective customers.
- Produce a Product Definition document.
- Work closely with design, business management and customer throughout the product development process to ensure development remains on track.
- Evaluate products in the lab.
- Provide technical support to Tier 1 customers to design in  power management products.
- Travel 1-2 weeks per quarter to meet customers.
- Communicate with the rest of the  team so that everyone is fully informed.
- Work with Business Management and Design to assure we have both a solid business case as well as a sound technical solution.
- Define a product roadmap.
- Research competitive solutions and devise better ones.
- Creatively solve customer problems; avoid non-competitive 'me-too' approaches.
- Author preliminary 'paper tiger' data sheets.
- Create and deliver compelling, targeted customer presentations.

Support our Field team with the latest data and presentation

- A BSEE and 5 years relevant experience
- Experience and detailed knowledge of  Power Management ICs for handheld applications including cellular phones, Smart Phones, and other portable consumer equipment.
- Experience in proposing and defining Power management IC products.
- Intimate knowledge of various regulator architectures.
- Expertise in using lab equipment to debug and evaluate power management products.
- Ability to understand the customers' problems and needs, and to propose a solution.
- Excellent verbal and written communication skills.
- Demonstrated ability to work within a cross-functional team.
- Demonstrated ability to self-manage, and meet deadlines.
- Mobile Phone system architecture knowledge is a plus.
- Knowledge of Tier 1 handheld customers in North America is a plus.
- Knowledge of audio functions (codecs, speaker amps) and mobile phone interfaces (I2C, I2S, MIPI/Slimbus) a plus.

Director of application opportunity

From:  Frank Wang (frank.wang@maximintegrated.com)

To:      ken_lenk@yahoo.com

Date:  Friday, June 17, 2016, 09:18 AM MST


Hi Ken,

Thanks for your reply through linkedin. Please send me up-to-date resume directly if ready.

Btw, what reason you left Maxim in 2005?

Frank Wang

Sr. Talent Acquisition

Phone: (425) 505-3234

Maxim Integrated | www.maximintegrated.com

**Thank you for Applying at Maxim Integrated for Senior Business Manager (Battery Management Systems)**

From:  Workday maximintegrated (maximintegratedproducts@myworkday.com)

To:    ken_lenk@yahoo.com

Date:  Saturday, June 5, 2021, 01:19 PM MST

Dear Kenneth Lenk ,

We appreciate your interest in Maxim Integrated and your application for the position of Senior Business Manager (Battery Management Systems) . After sincere consideration, we have decided to move forward with another candidate whose background is a closer fit for the required skill set. We encourage you to apply for other advertised positions at our company that you feel qualified for. Our team will keep your resume on file for consideration at a later date should a suitable position arise. Thank you for your interest in our company; we wish you personal and professional success with your job search.

This email was intended for ken_lenk@yahoo.com

# Thank you for Applying at Maxim Integrated for Senior Business Manager

From:  Workday maximintegrated (maximintegratedproducts@myworkday.com)

To:     ken_lenk@yahoo.com

Date:  Wednesday, June 30, 2021, 07:13 AM MST

Dear Kenneth Lenk ,

We appreciate your interest in Maxim Integrated and your application for the position of Senior Business Manager . After sincere consideration, we have decided to move forward with another candidate whose background is a closer fit for the required skill set. We encourage you to apply for other advertised positions at our company that you feel qualified for. Our team will keep your resume on file for consideration at a later date should a suitable position arise. Thank you for your interest in our company; we wish you personal and professional success with your job search.

This email was intended for ken_lenk@yahoo.com

# Thank you for Applying at Maxim Integrated for BMS SMTS, Applications Engineer

**From:** Workday maximintegrated (maximintegratedproducts@myworkday.com)

**To:** ken_lenk@yahoo.com

**Date:** Tuesday, July 6, 2021, 01:05 PM MST

Dear Kenneth Lenk ,

We appreciate your interest in Maxim Integrated and your application for the position of BMS SMTS, Applications Engineer . After sincere consideration, we have decided to move forward with another candidate whose background is a closer fit for the required skill set. We encourage you to apply for other advertised positions at our company that you feel qualified for. Our team will keep your resume on file for consideration at a later date should a suitable position arise. Thank you for your interest in our company; we wish you personal and professional success with your job search.

This email was intended for ken_lenk@yahoo.com

# Thank you for Applying at Maxim Integrated for Senior Business Manager

From: Workday maximintegrated (maximintegratedproducts@myworkday.com)

To: ken_lenk@yahoo.com

Date: Thursday, July 22, 2021, 11:47 AM MST

Dear Kenneth Lenk ,

We appreciate your interest in Maxim Integrated and your application for the position of Senior Business Manager . After sincere consideration, we have decided to move forward with another candidate whose background is a closer fit for the required skill set. We encourage you to apply for other advertised positions at our company that you feel qualified for. Our team will keep your resume on file for consideration at a later date should a suitable position arise. Thank you for your interest in our company; we wish you personal and professional success with your job search.

This email was intended for ken_lenk@yahoo.com